by Gregory Johnbeck v. Aaron Griffith and Kellan by Daniel J. Kellan. Good afternoon members of the panel, counsel, Mr. Johnbeck. I'm here representing Aaron Griffith. A little background on this matter. It's a removal case. It's the one issue involved in this case. The denial of a removal petition on behalf of my client Aaron Griffith. Aaron is 25 years of age. Jonathan has a former husband. He's 29. He's employed by the Canadian Railroad. And pursuant to his employment a few years ago, he transferred to Mississippi, met Aaron Griffith. They got married, moved back to Illinois. They were married on February 23, 2008. The baby was born August 11, 2008. And less than a month later, September 8, 2008, Mr. Griffith filed a petition for dissolution of marriage. That is the background. I illustrate that to the court by way of showing this is a very short marriage and that Aaron originally is from the state of Mississippi and wants to go back. The standard of review, as you well know, is the manifest way to the evidence. I won't belabor that. And the trial court can only be reversed if it's against the manifest way to the evidence. And it appears that a manifest injustice has occurred. That begins with the Eckerd factors. I know you're all familiar with the Eckerd factors. They've been mentioned in every case that's been reviewed since Eckerd was decided. And those factors are, as you well know, the enhancement of the quality of life of the parent and the child, motives of the custodial parent, motives of the non-custodial parent, visitation, how it affects visitation and whether a visitation schedule can be fashioned that's reasonable under the circumstances. Of course, these factors, as you well know, have been modified by the Kallenborn case to bring in the idea of the palpable nexus, the idea that the best interest of the child cannot easily be severed from the best interest of the parent with whom the child resides and upon whom that child depends for the child's emotional and physical well-being. Sum it up, in this case, happy mom, happy child. It's basically as simple as that. We are suggesting that Judge Brumman's decision in this case was against the manifest way to the evidence because he did not sufficiently consider the palpable nexus between the move to Mississippi as opposed to requiring Aaron to remain in Illinois in the village of New Lenox. We're suggesting that Judge Brumman, in his decision, you may recall reading it, said, well, I've heard everything nice about Mississippi, nothing so much about New Lenox, and as a comparison of the two, he basically said, not basically, he did say that there was really no difference between New Lenox and Brookhaven, Mississippi. In this particular case, we're suggesting that he's palpably wrong. As I mentioned in my brief, the big issue in this case is the fact that we have a 25-year-old woman, we have a one-year-old child at the time, I think the child will be two this August, so we have a fairly young child, and we have no support system in New Lenox where she currently resides. She's 25 years old, she has a degree from a community college, she wants to go back to school, and to do all of that stuff, to work full-time or go part-time to school with the daycare responsibilities and all of that type of stuff that's involved in pursuing those goals, which everybody seems to think is laudable, at least in the case of the 604B evaluator, and Judge Brumman mentioned that those are laudable goals. And we believe that he has not provided for Erin to obtain those goals. Judge Brumman gave custody of Ella, the child's name is Ella, to Erin. He trusted her with raising and nurturing the child, which includes fostering a relationship with her father, and he gave her the job, but not the means to perform the job. It's similar to having the children of Israel and telling them to build the pyramids and not giving them any bricks and saying make your own bricks, which I submit is what has happened here, is that she has custody, she needs an education, she needs, in order to raise this child, she's going to need a network of family and friends which has been deprived of her. I'm submitting to the court that I've been working full-time when I went to school, going full-time, working a job, running up to law school, studying. I didn't have a child, and I can submit that a person that has a child that wants to do all those things, as a single parent, it's impossible. You do need a network of friends, family, and people to help you out in this particular, in that particular situation, and she's been moved out of Mississippi to here and given this full-time double job, raising a child, going to school, or working. The type of job that she would get, I'm submitting to the court, would be not your type of a job that you could actually support yourself on. It would probably be a $10, $12, $15 an hour job, which would be extremely difficult to have daycare and all of that to actually function. So I would think that if she's required to stay in Illinois, it would be difficult, if not impossible, to obtain an education and become self-sufficient in that way. So Judge Brumman and the 604B evaluator, they seem to say, well, you know what, we looked at Illinois, and we looked at the jobs in Illinois, you can get a job in Illinois, probably better than you can in Mississippi. The schools are as good or not better in Illinois. It's okay because you can stay up here and you can do all of those things. I'm submitting that that's just not realistic, and that's what's against the manifest way of the evidence, and that's what the appearance of an injustice is, that it's just not possible for her to raise a child and go on with her life as she has a right to do after a divorce. I'm submitting that Judge Brumman has ignored the difficulties of a single mother to raise and nurture a child and pursue education and a job at the same time. What about the relationship with the father? The relationship with the father is strained. Obviously, it's very strained. Judge Brumman did mention that it's time for both of you to grow up, so both of you are very immature. He agreed with the evaluator when he said that. The child's relationship with the father. I understand that, Judge, and I'm trying to address that. Judge Brumman gave her custody, and part of the responsibility of the custody is to nurture a relationship with the father. Hopefully, that will be accomplished as these people, my client and the former husband, mature and grow up and get a handle on this particular situation. But you are right. It's her obligation to do that, and that's a point I was going to raise later, is that Judge Brumman gave her custody of the child, hopefully with that in mind, because if it's really that bad, maybe he should have given custody to Dad if that was the case where it was that egregious. This is a bitter divorce. It's a situation where both parties, and he mentioned this, I don't know, these parties are pretty bitter. I don't know why it is. It's not come out in the evidence, but I hope he can bury the hatchet. That has to happen. I don't know if a court, any kind of court, can order that to happen. I'm submitting that that happens over time. Does that answer your question? Well, the visitation schedule that was proposed by the mother doesn't seem to mesh with the recommendations of the child evaluator. In what sense, Your Honor? Well, she said that it's important for a child that age, and the child at that time was less than a year old, to have routine and frequent visitations with the father. And that's the problem with a removal case. It always will affect the visitation. I think I mentioned my grief that it would be a fool's errand to deny that. And the visitation that can be provided is probably more, as a child is a preschooler, there is a suggestion of extended weekends once a month, then spring and Christmas and summertime visitation. Mr. Griffith mentioned one week a month while the child is a preschooler. As a child gets older, the evaluator mentioned the technological innovations that we have with the Internet, Facebook, and all that type of stuff we have. Soldiers in Iraq and Iran that are watching the birth of their babies over the Internet. So I think as a child gets older, the innovative technological communication devices will be more readily available. Yeah, it's not easy. These are not easy cases. That's true. And the visitation by the father, if you reverse this case, will be affected. Hopefully not adversely. But that's the reality of what we deal with in these removal cases. Were you the trial attorney? Pardon? Were you the trial attorney? No, I was not. Was there any evidence of the mother's access or her attempts to find employment or her attempts to get a school that would work as well? Well, I can tell you afterwards she was ordered to do a job search. The problem with that attempt to obtain a job search is that if you get a McDonald's job, a $12-an-hour job, a $15-an-hour job, and spend $200 in daycare, it's a wash. So I don't think she really attempted while this was going on to do that. She did, according to the record, look into some schools and that type of stuff in Illinois once. But I think her focus was on the litigation more so than preparing for the inevitability of a future that might require her to live in Illinois. She was probably thinking, ah, maybe get to move to Mississippi and things will be wonderful, I suppose. That was probably her focus. I'm guessing, I don't know. But I did cite some cases in my brief that I know my opponent is going to distinguish. I just wanted to show you or mention that I cited Henry, the marriage of Maine, for the proposition that a child would have a greater support system, a family support system. That was one of the indicators as to the conclusion of the court in that case to allow removal is a greater family support system. Quite frankly, that's the best argument I have, is that you're leaving a mother and a child basically without any help in Illinois. And that's the basis for the removal. And Ford v. Martinez, I cited for the idea that thoughtful consciences. I've got to admit, Brianna would say, that Judge Brumman did give this some thoughtful and conscientious deliberation. He decided against my client, and I'm submitting that while it may be thoughtful, he missed the boat as far as the family connections and the support system and network and all that type of stuff. And that's why I decided that case didn't give the proper weight to the increase in the quality of life that she may enjoy better in Mississippi than here. The Guthrie case, I cited for the fact that it's the most factually similar case that we have to this case. Young parents, young child going to Arizona, needing a job and a family network to help out with daycare and visitation, not visitation, daycare and childcare and that type of stuff. Okay, two minutes. The last case was Enray Parr, Enray the marriage of Parr. It talks about if you've got a person with a good faith reason for moving out of the state, then the custodial parent who has exercised visitation and has a relationship with his child should not have the veto power to override the move out of state. And that's what I cited the Parr case for. And in this case, Mr. Griffith does, in essence, have a veto power. I'll have more to say about that, although I'm implying so. Do we have any other questions? Okay, guess not. Thank you, Mr. Cowan. Mr. Jumbeck. May it please the Court, good afternoon. Mr. Cowan, my name is Gregory Jumbeck of Reach and Jumbeck and Associates, and I represent the Apple League, John Griffith. Mr. Cowan somewhat took away a little bit of my thunder when he focused straight at the beginning and agrees with me as to the standard of review, a manifest way to the evidence that has been a stalwart principle on removal cases under Section 609 all the way since 1988, going back to Eckert, and going back subsequently in 2003 to the Collingborn case. The case that I believe is somewhat more factually appropriate is actually one that Justice Litton, you said on the panel, which is actually the last case I wrote a brief on her removal for or assisted on, and that was the Hansel case. Granted, in Hansel we had a 604.5 evaluator, Dr. Hatcher. Dr. Hatcher had recommended in that case that the removal would actually harm Sierra by move to North Carolina. In this case, we have the more neutral 604B evaluator, Dr. O'Brien, who also posits that the removal would actually harm Ella if this removal were to take place. And I don't want to sit back and wax poetically about the contents of the 604B evaluation, but one of the quotes, and I believe this gets to Justice McDade in one of your questions to Mr. Count, was that there is no way that the father-daughter relationship could be maintained in a healthy fashion if Ms. Griffith is permitted to remove to Mississippi. Ms. Griffith's family, specifically her father, based upon Ms. Griffith's report, is clear about their contempt for Mr. Griffith. Ms. Griffith only slightly veils her contempt for her soon-to-be ex-husband. When we examine the Ecker factors, and clearly each case is different in terms of which Ecker factors become the most important, in this case, the factors that are most important, in my mind, are number one, is there the reasonable and realistic visitation schedule that can be created? And two, how is the child's general quality of life going to be improved? And that actually is more of a common-born, indirect benefit analysis to a certain extent. Dr. O'Brien and Judge Brummond and the evidence all support the fact that there is no reasonable visitation schedule that can be put into place in this case to allow the removal. In fact, Ms. Griffith, on cross-examination, admitted that the 12-hour, roughly 12-hour, commute for visitation was not in our best interest. She proposed a visitation schedule of four days per month. One week at Christmas, one week at spring break, and then two weeks during the summer. That's less visitation than is awarded under the judgment. The judgment provides visitation of alternating weekends, two midweeks, standard holiday schedule, and four weeks to be non-consecutive of summer vacation visitation. This is the exact kind of contempt, a kind of concern, which Dr. O'Brien raised within her report, throughout her report. If any case is going to be removed, isn't it going to be a difficult proposition in terms of visitation? It's not going to be the same as every other weekend and maybe a night during the week. It's just not possible. So, I mean, aren't you dealing with that issue? It's either having to fly, if people have the money to fly, or to drive long distances in order to effectuate whatever visitation can be effectuated. Otherwise, we'd never remove anybody. Correct. And there's plenty of cases, Justice Linton, which say exactly that. And unfortunately, Judge Berman actually quotes that, unless these people had the income of Bill Gates, there's no way that this visitation schedule could be put into place. And while obviously in most removal cases, if not all removal cases, except for the few that have been to Wisconsin, Indiana, and Missouri, would not have the same visitation schedule, that doesn't get by the fact of, is this reasonable, is it realistic? And more specifically in this case, and it's contained within Dr. O'Brien's 604B evaluation that's part of our supplemental record, was that she found that this would actually harm the child. And she goes through some very important psychological concepts, one of which being object permanency. And the psychological theory that children, especially under the age of five, if they don't see you, they don't feel you regularly, they can't associate that there's care there without the person being present. And that's the exact problem in a case like this, with a child who's quite as young as Ella, and we look at the best interest, and is there a visitation schedule that's reasonable and realistic? To an extent, you could say that pre-starting her educational pursuits, it would be a realistic visitation schedule in terms of the four days once a month, because you're almost equating at least the weekend portion of the visitation. However, it's not realistic and reasonable to proffer and to get to the best interest of the child, because the ability to have that parent-child relationship is almost just completely disintegrated by the move. And I think it's also important, and it was unrebutted testimony at the trial court, my client would spend almost 36 hours straight awake. Almost half of his visitation would be spent either sleeping or driving. What kind of bonding time, which is really what we're getting into in terms of the best interest in a removal situation, can you really have? In plenty of these cases that have been reported, we have situations where the non-removing parent can either go see the child when they're out of the state or the child's going to be coming back once a month for these extended visitations. But except for the Guthrie case, which Mr. Canlon referred to, there are no reported cases dealing with a child quite so young as we are in this case. And with the evidence that was presented, and mind you, Dr. O'Brien wasn't called as a witness. There was no impeachment. There was no questioning. There was nothing as to her findings that this would not only not be in Ella's best interest, but that it would actually provide a harm for Ella if the removal were allowed. And a lot of that gets into the visitation situation. So while in some situations when there's older children, that relationship has already been established between the parent and the child, that the child can cognitively and psychologically accept, that's just not present here. So it almost makes the reasonable and realistic visitation schedule psychologically impossible in terms of that factor. The next aspect that I believe is most important in terms of the analysis, both by Judge Brumman and under the Manifest Weight of the Evidence standard, is the general quality of life enhancement, if the removal were granted. And again, this kind of starts out with Justice McDade, one of your questions to Mr. Canlon, is that she didn't look for a single job. She even testified in cross-exam. I didn't even turn on the internet. Didn't check for a job yet. She applied to one school, or looked at one school. She didn't apply, I'm sorry. And that was Governor's State University. Other than that, it was Mississippi College and Mississippi College only. I'm going back to Brookhaven, and that's it. I'm not going to search for a job. And while Mr. Canlon does point out the fact that there is going to be daycare costs, etc., etc., that will be incurred if removal were denied, that ignores the aspect of the judgment for dissolution, which reserves my client's payment and or contribution towards daycare until such time as Ms. Griffith obtains employment. So it's not as if she's going to spend every single penny that she receives in income back on daycare. That's going to be determined by the court upon her actually obtaining that job. Ms. Griffith also ignores the fact that under her theory of going back to school and work, under this evidence, she'd be spending at least 37 hours, not including travel time, per week, away from Ella. So now who's raising Ella under her theory of traveling the 55 miles up to Jackson, Mississippi, to go to Mississippi College? Her mother is. And this is exactly what the evaluation of Dr. O'Brien gets back to. And when we get back to the situation of, well, who's really caring for this child? Ms. Griffith wants to supplant Mr. Griffith with her family. Next, how can it be said that the general quality of life under the evidence on this record is going to be increased for Ella when the evidence, and there's three exhibits that were admitted without objection, that outside of the District of Columbia, the state of Mississippi has the worst health care system. Outside of the District of Columbia, Mississippi has the worst educational system. Is this true in the region that she lives in? The exhibits that were admitted were just for the statewide and national analysis. I was not trial counsel either, so I'm just going off what the exhibits were. And finally, the last exhibit that was admitted also demonstrated that the state of Mississippi is the least livable state, or is considered the least livable state, in the Union. I don't believe that one included the District of Columbia. So what evidence was there before the trial court to demonstrate that this move was actually going to increase the general quality of life of Ella? There was none. And if we just get back to the plain and unambiguous language of Section 609, that the best interests of Ella is full removal. I can't sit here and say that Ms. Griffith doesn't believe that it's not in her best interests to stay here. She clearly wants to leave, and she believes it's best for her to leave. And she claims that she'll have no support system should she stay here, and that Ella will have no support system should removal be denied and she's required to stay here. But I would posit back the question, is not the biggest support system that baby Ella could have to have both of her parents in a reasonable proximity? And I would say that that is, in fact, in her best interest. And that is, in fact, a very strong support system, perhaps the best support system that this child could have. Because the question is not, is it in the best interest of Mrs. Griffith to remove the child and to move back to Mississippi? It's, is it in the best interest of Ella to be removed down to Mississippi? In between the 604B evaluation, which clearly is not binding on the court, nor would I say that it was binding on your honors, however, was there sufficient evidence? There is more than sufficient evidence. The manifest way of the evidence supports the denial of the petition for removal. We respectfully request that you affirm the trial court's decision denying the removal to the state of Mississippi. Thank you. Thank you, Mr. Jumbach. Mr. Catlin and everybody. I've got a few words to say about that. Sure. First of all, the Hansel case that Mr. Jumbach and my esteemed colleagues are so proud of is easily distinguishable. I know this court decided that case and decided against removal of Judge Barron's decision. But I'll tell you what. If my client was in the same position as Mrs. Hansel, I'd withdraw my petition for appeal, legal appeal here. Because in that particular case, the number one they found was harm to the child. But the parent in the Hansel case was a professional person. She was a school teacher. She had resided in Illinois practically all of her life. The only reason she wanted to move to North Carolina was because she wanted to get married. But she had roots in Illinois. She had a profession in Illinois. And the only reason she wanted to go was because she was marrying someone else. So the Hansel case, I don't think it's really on point. The 604B evaluator, Mr. Jumbach, indicates there were findings of harm to the child. I don't believe the record found that there would be harm to the child. In fact, I believe he said the only harm to the child would be not being seen as his daughter as much as he would if the child were to remain in Illinois. I believe that's what's in his decision. If you reread it, I believe that's the essence of what he was saying. I don't think he specifically found that there was going to be harm to this child if she leaves the state of Illinois. The palpable nexus, it's a question between the palpable nexus, happy mom, happy child, as opposed to the visitation rights and whether a visitation schedule can be arranged for the father. And the cases I've read, looked at here, moving to Arizona, Massachusetts, Florida, Colorado, none of those states are any further than Mississippi. That is probably as far as some of those states. But, I mean, the distance is formidable. There's no question about it. And there will be an effect on visitation. And maybe Mr. Jumbach talks about, well, her father's here. You know what? I've honed through the record. I've looked high and low. Mrs. Griffin is going to have to find the daycare provider. If the child is sick, she's going to have to leave school or her work to go pick up the child. If the child has to stay home, who misses work, who misses school? Mrs. Griffin. She has to get a babysitter or a daycare provider to watch the child while she goes to school, after she goes to work. So you need two of them. But I didn't hear any testimony in the record. Mr. Griffin did not have been swearing to testify that, My God, I'll be there to pick up the child if you need to. I'll take off work. I'll go there and pick up her if she's sick. I'll stay home with her if she's ill. I'll watch the child while you go to school. I didn't see any of that testimony in the record. So I'm submitting that Mr. Dunbeck is being somewhat disingenuous when he mentions that Dad's going to be there. There's no evidence of that. These people, I will submit, do have to grow up and share the load. But right now, there was no evidence that Mr. Griffin is willing to share the load. Did he not say something about wanting the right of first refusal? I don't think he did that. I don't recall that, Your Honor. It's possible. I don't recall that. If you saw it, maybe. I don't recall that. But there's a lot of things I don't recall. But in any event, thank you. The point of the matter is that she needs a network of people to help her raise this child. She doesn't have one. And in order to tell, he says, in one of the things, I do remember this, Justice McDade, where he says, well, you know what, maybe if I could have the child seven days a week, seven days, one week out of the month, and my wife, I don't really want that because, you know what, I have to have daycare. I wouldn't be able to see the child all the time. I've just got to work. Well, there's a perfect opportunity to bond with your daughter. Get her up in the morning, get her breakfast, schlep her off to the daycare, go to work, come back home, pick her up, and start the day all over again. And I think that would be good therapy for Mr. Griffin. Thank you. Thank you, Mr. Cowan. And thank you both for your arguments today. We do appreciate it. We will take this matter under advisement and get back to you with a written disposition.